# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

**Jenevieve Spicer,**                                Civil No. 11-3679 (RHK/JJG)

           Plaintiff,

v.                                **REPORT AND RECOMMENDATION**

**Michael J. Astrue**,

Commissioner of Social Security,

           Defendant.

---

JEANNE J. GRAHAM, United States Magistrate Judge

Plaintiff Jenevieve Spicer (Spicer) seeks judicial review of the denial of her applications for disability insurance benefits (DIB) and social security income (SSI) under the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The case was referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), and is presently before the Court on cross-motions for summary judgment (Doc. Nos. 14, 19). For the reasons set forth below, the Court recommends that Spicer's motion for summary judgment be granted in part and denied in part, and Defendant's motion for summary judgment be denied.

## I.    BACKGROUND

Spicer protectively filed applications for disability insurance benefits and supplemental security income on April 23, 2008, alleging a disability onset date of April 30, 2007, when she was 26-years-old. (R. at 79-91.)[1] She alleged disability from back injury, left leg numbness, asthma and depression. (R. at 141.) From November 1997 through August 2004, Spicer held various short term jobs in telemarketing, fast food restaurants, retail sales, and a poultry plant.

---

[1] The Court cites the administrative record in this matter, Doc. No. 12, as "R."

(R. at 174, 211.) Spicer worked in fast food restaurants from September 2004 through May 2007. (*Id.*) She worked briefly as a cashier at a gas station in June 2007. (R. at 181.) She strained her back in April 2007, had back surgery in August, and never returned to work. (R. at 144-45.) Spicer testified at a hearing before an administrative law judge ("ALJ"), and the ALJ denied her disability claim on August 23, 2010. (*Id.* at 5-15 and Supplemental Administrative Record ("SAR") at 586-624, Doc. No. 13). The Appeals Council denied review, and Spicer filed this action for judicial review on December 22, 2011. (R. at 1-4.)

### A.    Medical Evidence in the Administrative Record

Before her alleged onset date, Spicer had a history of back pain. In 2001, she had nerve release surgery to treat her left thigh pain and numbness. (R. at 436). Six years later, shortly after her alleged disability onset date of April 30, 2007, Spicer went to the emergency room ("ER") at St. Mary's Regional Medical Center ("St. Mary's") after she felt a pop in her back, causing severe pain. (R. at 219.) Spicer was given a prescription for Vicodin. (R. 219-20.)

Spicer followed up at her primary care clinic, Min No Aya Win Clinic, with Nurse Magdelena Reynolds Allen ("Allen"), on July 5, 2007. (R. at 317.) Spicer complained of back pain, and her straight leg raise test was positive, and reflexes were abnormal. (*Id.*) Spicer's MRI showed a large herniated disc fragment at L4-5 on the left with significant caudal extension; and a small contained herniation of L2-3 on the left. (R. at 229.) In a neurosurgery consultation at St. Luke's Duluth Neurosurgical Institute, Dr. Stefan Konasiewicz noted Spicer was 26-years-old, and obese at 5'7" and 260 pounds. (R. at 438-39). Her MRI showed significant compression of the thecal sac and nerve roots at L4-5. (R. at 439.) Dr. Konasiewicz diagnosed left L4 and possibly L5 radiculopathy with spinal stenosis, and found Spicer to be a candidate for

surgery.  (R. at 439.)  He could not guarantee improvement of neurological function with surgery, because Spicer had progressive foot drop[2] on the left.  (*Id.*)

Spicer had back surgery on August 16, 2007.[3]  (R. at 239.)  Dr. Konasiewicz advised Spicer not to lift, push, pull or twist more than ten pounds for the next six weeks, and not to drive for one week.  (*Id.*)  On September 4, 2007, Spicer went to the ER at St. Mary's, reporting her left thigh pain was worsening.  (R. at 283.)  On examination, Spicer had no tenderness in her back or left thigh, and little difficulty with dorsiflexion and plantar flexion.  (*Id.*)  Two days later, Spicer told Dr. Konasiewicz that she had some back pain and intermittent leg pain after doing a lot of heavy lifting and activity.  (R. at 442.)  He told her to wear her abdominal binder and not to overdo activities.  (*Id.*)  A few days later, she had some improvement.  (R. at 443.)

Spicer went to the ER on September 15, 2007, reporting severe back pain.  (R. at 281-82.)  On examination, Spicer was healthy appearing but moved slowly and cautiously; straight leg raise test was negative; there was no definite motor or sensory loss in her left lower extremity; and her range of motion was limited by pain, but intermittently strong.  (*Id.*)  Dr. Keeling treated Spicer with Dilaudid, but said Spicer needed to be in a chronic pain management program.  (R. at 281-82.)  He opined that psychosocial factors were part of her distress; and she should not be treated with narcotics.  (*Id.* at 282.)

Four days later, Spicer saw Dr. Konasiewicz.  (R. at 444).  She had some mild weakness in her left foot and ankle, but improved since surgery.  (*Id.*)  She was ready to start physical

---

[2]  Foot drop is partial or total inability to dorsiflex the foot, a consequence of which is the toes drag on the ground during walking unless a steppage gait is used.  *Stedman's Medical Dictionary* 698 (27th ed. 2000).  Foot drop has many causes, including disorders of the central nervous system, motor unit, tendons and bones.  (*Id.*)

[3]  The surgery consisted of partial left L4 hemilaminectomy, partial left L4, L5 facetectomy, left L4, L5 discectomy, left L5 nerve root foraminotomy, partial left L5 hemilaminectomy, and partial left L5-S1 facetectomy.

3

therapy.  (*Id.*)  However, Spicer went to the ER at St. Luke's on September 23, 2007, after exacerbating her back pain while driving home from Arkansas over the weekend.  (R. at 237.) Dr. Steven Hansen treated Spicer with injections of Dilaudid, Vistaril, and Lortab.  Spicer sought additional pain medication the next day at Min No Aya Win Clinic, requesting Percocet instead of Lortab.  (R. at 312.)  She was given a Toradol injection, and Neurontin.  (R. at 313.)  Three days later, Spicer asked Nurse Allen for pain medication.  (R. at 310).  Allen would not give her Percocet but prescribed Ultram and a muscle relaxer.  (*Id.*)

In follow up with Dr. Konasiewicz on October 22 2007, Spicer's examination revealed left foot weakness and numbness.  (R. at 445).  The next day, Spicer told Nurse Allen she wanted a work release note for six weeks while she was in physical therapy; and she wanted more pain medication.  (R. at 308).  Allen prescribed ten Lortab pills.  (*Id.*)

Spicer went to St. Mary's ER again on November 10, 2007, after accidentally falling. (R. at 280).  On examination, she had no acute neurological symptoms, mild tenderness in her back, and a normal motor exam, with the exception of limited range of motion in the left foot. (*Id.*)  X-rays showed no injury; and she was treated with Lortab.  (*Id.*)  About a month later, Spicer complained to Dr. Konasiewicz of left hip pain and right leg symptoms.  (R. at 446.)  Her examination was mostly normal.  (*Id.*)

Then, on December 14, 2007, Spicer was treated in urgent care at St. Luke's for complaints of an exacerbation of pain.  (R. at 233.)  Five days later, Spicer made two trips to St. Mary's ER for narcotic treatment of back pain, due to coming to a sudden stop in her car. (R. at 271-74).  She went to the ER again a week later, reporting she hurt her back falling down some steps.  (R. at 267-68).  There were no acute abnormalities on her x-rays.  (R. at 268.)

Spicer had a lumber MRI on December 28, 2007, showing post-operative fibrosis on the left at L4-5 and L5-S1, and a small to moderate left nuclear herniation at L2-3, with possible compromise of the left L3 nerve root.  (R. at 243-44).  Two days later, Spicer went to St. Mary's ER, where Dr. Daniel Campbell described her as an anxious patient who appeared to be "maximizing her symptomatology."  (R. at 269.)  Objectively, Spicer moved fairly easily without significant pain; and she was neurologically intact, and clinically stable for her two-and-a-half-hour visit.  (*Id.*)  Dr. Konasiewicz reviewed Spicer's recent MRI on January 2, 2008.  (R. at 447.)  He noted a small disk herniation at L2-3, with some compression of the thecal sac and left L3 nerve root, no right-sided nerve root compression, and no significant compression of the thecal sac or nerve root at L4-5 or L5-S1.  (*Id.*)  Spicer said she wanted to return to her job at a fast food restaurant; and Dr. Konasiewicz told her to return in one week.  (*Id.*)  Two weeks later, Spicer said she was seeking a second opinion about returning to work, because she was still struggling with pain and drop foot.  (R. at 323.)

To get her second opinion about returning to work, Spicer saw Dr. Nayyer Mujteba at Duluth Clinic on February 26, 2008.  (R. at 361-62.)  Spicer told Dr. Mujteba she did not think she could return to work without restrictions, because she had low back pain, worse with sitting, standing or walking; and radicular symptoms in her left leg.  (R. at 361.)  On examination, Spicer

Spicer next sought treatment at St. Mary's ER on January 30, 2008, after a low speed accident in her car.  (R. at 262.)  Subjectively, her pain was not controlled by morphine.  (*Id.*)  Objectively, Spicer appeared comfortable, and Dr. Campbell again noted she seemed "to be maximizing her symptomatology."  (*Id.*)  She exhibited dramatic tenderness to light touch of her lumbar spine; there was no evidence of spasm; and she was clinically stable for the four-and-a-half-hour visit.  (*Id.*)

ambulated independently; she had no difficulty sitting or standing; she was morbidly obese; there was no acute pathology of the thoracolumbar spine; her lumbar pain increased with flexion and extension; straight leg raise tests were negative; her strength was intact on the right; she had less strength on the left, and some numbness in the L5-S1 distribution. (R. at 362.) Dr. Mujteba completed a work ability form for Spicer, releasing her to light work, with no climbing and occasional bending and squatting, limited to six hours per day. (R. at 389.)

On March 29, 2008, Spicer went to the ER at St. Mary's for worsening pain and radicular symptoms. (R. at 260.) She was wearing an ankle brace for weakness of the left foot. (*Id.*) She was given a prednisone burst, and advised to see Dr. Mujteba for narcotic refills. (*Id.*) Several days later, Spicer said she exacerbated her back pain by carrying laundry up and down two flights of stairs. (R. at 300-01). She was treated with Toradol. (R. at 301.)

Spicer then had a lumbar MRI on April 8, 2008, indicating L2-3 left-sided focal disc prolapse with slight narrowing of the left lateral recess; and L4-5 postsurgical changes without significant recurrent disc prolapse. (R. at 336). Spicer said that she had no relief from her back pain since shortly after her surgery, and she had unrelenting pain on both sides. (R. at 294.) Spicer was taking MS Contin for pain, but it was causing chronic constipation. (R. at 295.) Spicer was also taking Wellbutrin and Nortriptyline. (*Id.*)

Spicer went to the ER again in April; this time for treatment of arm pain and difficulty sleeping that was not relieved with Valium. (R. at 258.) She was treated with Dilaudid and Toradol. (*Id.*) After going to the ER twice for narcotic treatment, Spicer saw Nurse Allen and said her pain was not controlled. (R. at 291-92.) Allen noted this was the second time Spicer said she was out of pain medication because her cousin stole them. (*Id.*) She gave Spicer pain

medicine for three days, but said Spicer would not get any more early refills if her medication was lost or stolen. (*Id.*)

Spicer underwent a neurological consultation with Dr. Nancy Ensley at Duluth Clinic on May 14, 2008. (R. at 364-67.) Spicer reported that after her August 2007 surgery, her left leg symptoms mostly resolved, but her back pain worsened after a few falls and other accidents. Now, she had trouble sleeping and weakness in her left leg. (R. at 364.) On examination, Spicer showed four out of five Waddell signs.[4] (R. at 366.) Dr. Ensley diagnosed lumbar spondylosis, with mild left thoracolumbar scoliosis and residual weakness in the left L5 distribution, and possible left L3 or L4 radiculopathy. (R. at 367.) She recommended orthotics for Spicer's left ankle, encouraged Spicer to walk as much as possible, and to participate in a chronic pain program. (*Id.*)

Five days later, Spicer underwent a nerve conduction study, indicating chronic mild low back pain radiating into the left leg, no evidence of axonal nerve damage, and good news that lost nerve function in some muscle groups was reversing. (R. at 368.) On the same day, Dr. George Salmi reviewed Spicer's social security disability file at the request of the SSA, and completed a Physical Residual Functional Capacity Assessment ("RFC") form. (R. at 341-48.) He opined Spicer could perform light work with limited use of foot controls on the left; never

---

[4]  "Waddell signs are a group of 8 physical findings divided into 5 categories, the presence of which has been alleged at times to indicate the presence of secondary gain and malingering." D.A. Fishbain, R.B. Cutler, H.L. Rosomoff, R.S. Rosomoff, *Is There a Relationship between nonorganic physical findings (Waddell signs) and secondary gain/malingering?* Clin. J. Pain (2004 Nov.-Dec.) 20(6): 399-408 (finding the preponderance of the evidence points to no association). Available at http://www.ncbi.nlm.nih.gov/pubmed/15502683.

climb ladders, ropes and scaffolds; and all other postural movements such as bending, kneeling and crouching were restricted to occasional. (R. at 342-43.)[5]

Spicer saw Dr. Ensley again on June 13, 2008. (R. at 372-73.) Spicer said she would start the chronic pain program in July. (R. at 373.) Dr. Ensley diagnosed: (1) chronic mild left L5 radiculopathy with some reinnervation; (2) weakness in the left foot, doing better with a brace; (3) recent onset of radicular symptoms of the right leg; (4) obvious lumbar spondylosis; (5) history of some sort of decompressive nerve procedure in the left thigh, likely involving a branch of the femoral nerve. (*Id.*) Dr. Ensley recommended a pain program, physical therapy, massage, walking and weight loss, and to return in four months for an MRI. (*Id.*)

Next, Spicer saw Nurse Allen at Min No Aya Win Clinic on June 19, 2008. (R. at 524-25.) Spicer said her last epidural injection did not help, and she was concerned her medications were interfering with her sleep and causing panic or difficulty breathing. (*Id.*) Spicer asked about increasing MS Contin, but Allen said to hold off until after having a sleep study; and she gave Spicer a Toradol injection. (*Id.*)

Dr. Ensley wrote a letter for Spicer on June 23, 2008, stating in relevant part:

> [S]he obviously would not be able to have much in the way of employment. In addition, there may be other aspects to her medical status that would affect her ability to work. Just the medications she is requiring [Neurontin and morphine] for her pain would keep her from driving. At this point, I would consider supporting her application for Social Security disability. She has completed her high school education and taken some courses in college. If there would be any way to help her attend college, it is possible she may be employable in the future. But, once again, she should not be driving with the narcotic medications she is requiring for pain control. Obviously, over time there is a small chance she may improve enough where my opinion could change."

---

[5] Dr. Sandra Eames reviewed Spicer's file on October 16, 2008, and affirmed Dr. Salmi's opinion. (R. at 423-25.)

(R. at 350-51.)

On July 15, 2008, Spicer underwent a psychological consultative exam with Dr. Marlin Trulsen at the request of the SSA. (R. at 352-58.) Spicer said she has been depressed since age twelve. (*Id.*) Her father was present and called her a "drama queen" who had trouble getting along with people at work, and she always had a crisis going on. (*Id.*) Spicer said depression made her tired, with no motivation or energy. (R. at 354.) During the day, she did some scrap booking, used her computer, texted friends, but mostly watched television. (*Id.*) She also took care of her pets and did some cleaning, laundry and shopping, but she was on a no-lifting restriction. (*Id.*)

On examination, Spicer was alert and oriented with a pleasant mood, but she overemphasized and intensified negative events in her life with little insight, suggesting a longstanding pattern. (*Id.*) Spicer reported a history of physical and sexual abuse, and she could not identify any strategies for handling her present difficulties. (R. 355.) In fact, she seemed to enjoy the "celebrity status" of having a disk disorder. (*Id.*) Spicer endorsed depressive symptoms. (*Id.*) She had an average IQ, adequate memory, and had a normal speech pattern. (R. at 355-56.)

Dr. Trulsen diagnosed a chronic adjustment disorder with depressed mood, and pain and personality disorders associated with both psychological factors and a general medical condition. (R. at 356-57.) He also noted Spicer had previously been diagnosed with a chronic depressive disorder with symptoms less severe than major depression.[6] (*Id.*) Dr. Trulsen gave her a GAF

---

[6] *See Dysthymia*, A.D.A.M. Medical Encyclopedia, available at
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001916/.

score of 65.[7]  (*Id.*)  He opined that Spicer's attention and concentration were average to low average, and she could carry out work-like tasks with average persistence and pace.  (R. at 357.) He believed she was capable of responding to brief and superficial contact with co-workers and supervisors, and would respect authority to an average level.  (*Id.*)  However, her ability to tolerate stress and pressure was average to low average.  (*Id.*)

In the pain management program in July, Spicer said her bulging disk was first identified at age seventeen, but she lived with it until 2007.  (R. at 374-79.)  After some relief for a few months after surgery in August 2007, her pain, especially in the left leg, became progressively worse, with constant pain and severe flares six or seven times a month.  (R. at 374-75.)  She spent most of the days watching television, and a little time cleaning and caring for her pets. (R. at 375.)  Spicer said she could sit for thirty minutes, stand for five to ten minutes, and walk a half block to two blocks.  (*Id.*)  She slept five hours at night and awoke several times.  (*Id.*) On examination, she was alert, oriented, obese, and in no acute distress.  (R. at 377.) Examination findings included weakness in the left leg and foot, limited range of motion of the left hip, limited lumbar range of motion, unsymmetrical reflexes in the ankles, and some decreased sensation of the left thigh and lower extremity.  (R. at 378.)  Spicer returned to St. Mary's ER on July 26, 2008, for treatment of pain in her low back, shoulders, arms and legs. (R. at 450.)  Dr. George Jackson noted that Spicer was on reasonable medical treatment for her pain, and there were no provoking events or objective findings, so there was a possibility of drug seeking.  (*Id.*)  The next day, Spicer made her third trip to the ER in 36 hours, complaining of

---

[7]   The Global Assessment of Functioning (GAF) is a numeric scale used by mental health providers to subjectively rate the social, occupational and psychological functioning of adults. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-tr") 32 (American Psychiatric Association 4th ed. text revision 2000).  Scores between 61-70 indicate some mild symptoms or some difficulty in social, occupational or school functioning.  *Id.* at 34.

popping and cracking in her back. (R. at 452.) Her straight leg raise tests were negative, and reflexes and strength were intact. (R. at 456, 458.) The ER physician talked to Spicer's primary care practitioner before increasing Spicer's Neurontin and morphine, and giving her Dilaudid. (*Id.*)

On July 28, 2008, Dr. Mollie Stapleton admitted Spicer to St. Mary's, where she was treated with steroids and IV narcotics. (R. at 462.) Dr. Stapleton diagnosed intrinsic nerve root injury at L4-5 on the left; and she discharged Spicer with a prednisone burst and methadone. (*Id.*) Several weeks later, Spicer's pain was much improved on methadone. (R. at 534.) Spicer's lumbar MRI showed postoperative scar tissue at L4-5 on the left; L2-L3 disk herniation unchanged since the prior study; and no definite significant change overall since the prior study. (R. at 478.) Her sleep study indicated periodic leg movements but no significant sleep disordered breathing. (R. at 463.)

In September 2008, Spicer was experiencing significant abdominal discomfort, and the next month she wanted to discontinue methadone. (R. at 542-48.) Nurse Allen recommended a Duragesic patch for pain, and she noted that Spicer's boyfriend "piped in" asking why she could not get Dilaudid and Percocet. (R. at 547-48.) On October 14, 2008, Dr. Ensley noted Spicer was stabilized on the pain patches, and nothing could be done for her surgically unless a new problem developed. (R. at 487.) She opined that Spicer was best served in the chronic pain program. (*Id.*) Dr. Ensley also noted Spicer was appealing her disability claim, and she encouraged Spicer in furthering her education. (*Id.*)

Spicer told Nurse Allen she had no pain using the Duragesic patch, but at the same time she requested a medication for breakthrough pain, which she rated a severity of eight out of ten. (R. at 549-50.) Allen prescribed Lortab, and Spicer completed an opioid agreement. (R. at 550.)

Spicer asked for a discharge from the chronic pain program on October 23, 2008, because she did not have transportation. (R. at 489.) At her next office visit, Spicer requested a stronger pain patch. (R. at 551.) On November 28, 2008, Spicer went to the ER for shoulder pain. (R. at 467.) X-rays were normal, and staff would not increase her medications, but she was given an injection of Dilaudid. (*Id.*)

On January 21, 2009, Spicer asked for an increase in Lortab, and an early refill of her pain patches. (R. at 558-59.) Nurse Allen would not provide an early refill because Spicer had early refills the last two months. (R. at 559.) Allen referred Spicer to Dr. Ensley. (*Id.*) In the meantime, Spicer went to the ER to get more pain patches but was given only one. (R. at 471-72.)

On April 8, 2009, Spicer said her low back and left leg pain were worsening, with some pain down the right thigh. (R. at 507.) She was slightly uncomfortable upon examination, with positive straight leg raise test on the left and negative on the right. (R. 507-08.) On MRI, Spicer had a disc herniation causing mild compression of the L3 nerve roots bilaterally. (R. at 484.) Four days after seeing Dr. Ensley, Spicer went to the ER for nausea and abdominal pain, and requested additional pain medications several times before she was released. (*Id.* at 473-74.) Nurse Allen also increased Spicer's pain patch. (R. at 564.)

Dr. Ensley referred Spicer to Dr. Mark Glazier for a neurosurgery consultation in May. (R. at 510-11.) Dr. Glazier noted Spicer had a large L4-5 herniated disc on the left, with left foot weakness and diminished reflexes, and positive straight leg raise test on the left. (R. at 510.) He performed a left L4-5 discectomy on May 7, 2009. (R. at 475-76.) After surgery, Spicer's GI distress continued and worsened. (R. at 515-17.) Spicer's chronic constipation appeared to be the result of failure of the pelvic floor muscle. (R. at 516.)

In follow up with Dr. Glazier on July 20, 2009, Spicer reported some occasional discomfort, but motor testing was intact, and Spicer walked independently. (R. at 519.) Spicer said she did not feel she could return to work at that point, so Dr. Glazier gave her a letter stating she should be off work. (*Id.*) Spicer sought pain medication from Nurse Allen in August, but Allen was concerned about Spicer's history of friends taking her pain medication. (R. at 576.) She was also concerned about Spicer's boyfriend's interest in her pain medications, which he asked to be increased. (*Id.*) Spicer also reported she was trying to get pregnant and questioned whether scar tissue could be a problem. (*Id.*) She saw a physician at the end of September, and said she was trying to get pregnant for twelve years. (R. at 578.) In October, Spicer's chronic constipation continued secondary to narcotic use. (R. at 522-23.)

Spicer complained of severe bilateral leg pain in an office visit with Nurse Allen on October 27, 2009. (R. at 580.) Her straight leg raise test was negative bilaterally. (R. at 581.) Spicer wanted to be off narcotics and was planning weight loss surgery, but found it painful to walk. (*Id.*) Allen increased Spicer's Duragesic patch, and encouraged physical therapy. (*Id.*) One month later, Spicer asked Allen for medication to treat daytime anxiety with panic attacks, and for an increased muscle relaxant. (R. at 582.)

### B. Administrative Hearing

At the time of the hearing, Spicer lived with her fiancée, who also has a physical disability. (SAR at 594.) Spicer's last job was as a cashier at a gas station. (SAR at 595.) Her job ended because she had a herniated disk. (*Id.*) Before that, she worked at Hardee's. (*Id.*) She quit Hardee's when she strained her back, because she could not lift 25-30 pounds as required. (*Id.*) Spicer worked as a telemarketer in 1997 and 1998. (SAR at 616-17.) The job was performed sitting at a table wearing a headset. (SAR at 617-18.) Employees could not stand

up and walk around. (SAR at 618.) One of Spicer's two telemarketing jobs required a nine-hour workday, working three to four hours without a break. (SAR at 618-20.) Spicer said she could no longer work, because she could not sit or stand for long. (*Id.*) She feared that if she were to bend over, her disk would herniate again. (SAR at 611-12.)

Spicer testified that she had two back surgeries, which did not help. (SAR at 598.) Instead, her pain and numbness worsened. (*Id.*) Between her two surgeries, in the years 2007 and 2008, her symptoms were foot drop with shooting pain down the leg, back pain, and leg numbness. (SAR at 598-99.) Physical therapy has not helped her pain either; and she could not walk very far. (SAR at 599-600.) Although she wears a brace on her left leg, she still fell due to weakness. (SAR at 600.) Spicer does not often drive due to her usage of narcotics for pain, but sometimes she drives a half block or so. (SAR at 601-02.) She does ride in a car to her father's house 30-45 minutes away, but gets out to stretch on the way. (SAR at 610-11.) She has not engaged in recreational activities since her back was first herniated in 2007. (SAR at 602-03.)

As to daily activities, Spicer does not cook but sometimes gets herself snack foods. (SAR at 603-04.) She can lift a gallon of milk, but cannot do laundry, dishes or household cleaning. (SAR at 603-04, 621.) Her leg starts hurting after standing for fifteen minutes, and sitting hurts after 40-45 minutes. (SAR at 621-22.) She spends her day playing with her dog, visiting with people outside, watching television, visiting her mom next-door, and visiting with friends who come to her building. (SAR at 604-05.) Her boyfriend takes pain medication, but she does not share hers with him. (SAR at 605.) Her pain medication is helpful, but sometimes causes dizziness, nausea, headaches, and fatigue. (SAR at 606.)

Spicer suffers depression with some good days and some bad days. (SAR at 607.) On bad days, she does not want to leave the house or see people. (*Id.*) She stays inside one to three

days a week.  (SAR at 608.)  She takes citalopram for depression and anxiety.  (*Id.*)  She has mood swings and poor memory.  (SAR at 609.)  She uses a journal to remind herself to do things.  (SAR at 609-10.)

Ed Utities,[8]Vocational Expert, also testified.  (SAR at 613.)[9]  The ALJ asked Utities whether a person, aged between 26 and 29, with a GED and past work as per the vocational report, who would be limited to lifting and carrying twenty pounds occasionally, ten pounds frequently; sitting for six hours out of an eight-hour workday; standing and/or walking six hours out of an eight-hour workday; no ladder climbing, and occasional stair climbing, balancing, stooping, kneeling, crouching and crawling; and occasional exposure to extremes of cold, humidity and wetness; and occasional use of foot pedals with the left foot, would be able to perform Spicer's past relevant work.  (SAR at 614-15.)  Utities testified that such a person could perform the telemarketing and cashier jobs, although not the cashier job as she performed it, but as described in the Dictionary of Occupational Titles ("DOT") with a sit/stand option.  (SAR at 615.)

For a second hypothetical question, the lifting limitation was ten pounds occasionally and five frequently, standing two hours in an eight-hour day, sitting six hours in an eight-hour day, the same nonexertional and environmental limitations, and limited to semi-skilled work.  (*Id.*)  Utities testified the job of telemarketer would fall within those parameters.  (*Id.*)  Next, the ALJ added to the second hypothetical that the person would miss three or more days of work per week.  (SAR at 616.)  Utities said such a person could not perform any jobs on a full-time basis.  (*Id.*)  The ALJ asked a final hypothetical question, adding to the second hypothetical question

---

[8]  The vocational expert's full name is found on the Vocational Analysis Report.  (R. at 211.)

[9]  Utities struck dishwasher from Spicer's past relevant work in his vocational report, because Spicer testified she only did the job part-time.  (SAR at 613.)

that the person would need a sit/stand option every thirty minutes for a slight positional change. (SAR at 622.) The Vocational Expert testified that in his experience, many telemarketing positions allowed a person to stand and stretch for a short period. (SAR at 622-23.) Therefore, such a person could perform the telemarketing position. (SAR at 623.)

### C.    ALJ's Decision

The ALJ found Spicer had the residual functional capacity for sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), further restricted to never climbing ladders, occasionally climbing stairs, occasional balancing, stooping, kneeling, crouching and crawling, and simple, routine work. (R. at 11-12.) The ALJ considered the opinions of two state agency physicians who believed Spicer could work at the light exertional level with the same postural limitations the ALJ adopted. (R. at 12.) He gave Spicer "some benefit of the doubt" and reduced her RFC to sedentary. (*Id.*)

The ALJ said he placed considerable weight on Dr. Trulsen's opinion of Spicer's mental limitations. (*Id.*) He also placed significant weight on Dr. Mujteba's opinion for light work, with no climbing and occasional bending or squatting. (*Id.*) The ALJ did not consider Dr. Ensley's statement that Spicer "would not be able to have much in the way of employment" to be a suggestion that Spicer could not work, but rather that she would have some limitations. (*Id.*)

The ALJ next considered the credibility of the severity of Spicer's subjective complaints. (R. at 12-13.) He discounted her credibility because there are treatment records stating she maximized her symptomatology. (R. at 13.) The ALJ also considered Spicer's work history, and found her earnings to be erratic in the past. (*Id.*) Thus, he concluded that she stayed out of the workforce in the past for reasons unrelated to alleged disability. (*Id.*) The ALJ considered

the statements of Spicer's father, but did not give them much weight because his relationship with Spicer gave him incentive to endorse her disability application. (*Id.*) Finally, the ALJ relied on the vocational expert's testimony and concluded Spicer could perform her past relevant work as a telemarketer. (*Id.*)

## II.    STANDARD OF REVIEW

To receive SSI benefits, an individual must be found disabled as defined by the Social Security Act and accompanying regulations. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C § 423(d)(1)(A). It is the claimant's burden to prove disability. *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011).

On review of a decision denying Social Security benefits, a court examines whether the findings and conclusion of the ALJ are legally sound and "supported by substantial evidence in the record as a whole." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (citation omitted). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's decision." *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (citation omitted). Although the court must consider "[e]vidence that both supports and detracts from the ALJ's decision," the ALJ's decision may not be reversed merely because some evidence supports another outcome. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). If it is possible to reach conflicting positions from the record, but one of those positions is that of the ALJ, the decision must be affirmed. *Id.*

# III.    DISCUSSION

The Court will first address Spicer's argument that the ALJ relied on the Vocational Expert's testimony in response to a flawed hypothetical question, because the error requires remand.

## A.    Hypothetical Question to the Vocational Expert

Ultimately, the ALJ found Spicer was limited to simple, routine work. However, the ALJ did not include this limitation in the hypothetical question to the vocational expert. In the pertinent hypothetical question, the ALJ asked the Vocational Expert to assume the individual was capable of *semi-skilled* work. Thus, Spicer contends the Vocational Expert's testimony that the hypothetical person could work as a telemarketer, a semi-skilled job, is not supported by substantial evidence in the record.

The regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). Semi-skilled work is defined as "work which needs some skills but does not require doing the more complex work duties" and "less complex than skilled work, but more complex than unskilled work." 20 C.F.R. § 404.1568(b). Simple, routine work is consistent with unskilled work. *See Cox v. Astrue*, 495 F.3d 614, 621 (equating "simple, repetitive, routine tasks," "limited decision making required," and "limited changes of the work setting" with unskilled work.) Thus, the ALJ's RFC finding is inconsistent with his finding that Spicer could perform her past relevant semi-skilled work.

The Commissioner believes the ALJ's RFC finding for simple, routine work was only a mistake, and that the ALJ intended to limit Spicer to semi-skilled work, because the ALJ found Spicer had no severe mental impairments. But, even if the ALJ intended a limitation of simple,

routine work and left it out of the hypothetical, the Commissioner asserts the error is harmless, because the Medical-Vocational Guidelines indicate a significant number of unskilled jobs can be performed by an individual of Spicer's age, education and work experience. And, the Commissioner argues Spicer's other non-exertional limitations would not significantly reduce the numerous sedentary jobs in the national economy. Spicer replied that the court should address what the ALJ did, not what the Commissioner thinks he intended to do. Moreover, Spicer argues vocational expert testimony is necessary to determine the range of simple, routine, sedentary occupations that might be indicated by the RFC.

The ALJ's finding that Spicer was limited to simple routine work could have been based on pain or pain medications affecting her mental clarity. The fact that the ALJ found Spicer did not have a severe mental impairment does not necessarily mean the ALJ's RFC finding for "simple, routine work" was simply a mistake. The Court cannot guess what the ALJ intended. Where the ALJ's RFC finding is inconsistent with the hypothetical question he relied on in finding the claimant not disabled, remand is required. *See Guilliams*, 393 F.3d at 804 ("[a] hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'") (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)).

Nor can the Court say the ALJ's error was harmless. Assuming the ALJ intended to limit Spicer to simple, routine work as indicated in the RFC, then Spicer could not perform her semi-skilled past relevant work. If the claimant cannot perform her past relevant work, the burden shifts to the Commissioner to show the claimant can perform other work in the national economy. *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1993) (en banc). Simple, routine work is a non-exertional work restriction. *See Sanders v. Sullivan*, 983 F.2d 922, 823 (8th Cir.

1992) ("[n]onexertional limitations are limitations other than on strength but which nonetheless reduce an individual's ability to work," and include mental, postural and manipulative impairments) (quoting *Asher v. Bowen*, 837 F.3d 825, 827 n.2 (8th Cir. 1988)).  The ALJ "may use the [Medical-Vocational] Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines."  *Id.* (quoting *Thompson v. Bowen*, 850 F.2d 346, 349-50 (8th Cir. 1988).  The ALJ made no such finding here.

On remand, the ALJ must indicate whether he intended to restrict Spicer to semi-skilled or unskilled work, and the ALJ must provide reasons for his RFC finding that are supported by substantial evidence in the record as a whole.  The ALJ may only rely on the Medical-Vocational Guidelines to determine disability if the ALJ finds Spicer's nonexertional impairments do not diminish her ability to perform the full range of activities listed in the Guidelines.  Otherwise, the ALJ must pose a proper hypothetical question to a vocational expert, containing all of Spicer's impairments that are supported by substantial evidence in the record.  *Hunt v. Massanari*, 250 F.3d 622, (describing proper vocational hypothetical question).  The ALJ can rely on a Vocational Expert's response to a proper hypothetical to establish whether there are jobs available in the national economy for a person with Spicer's characteristics.  *See Thompson*, 850 F.2d at 349 (Vocational Expert testimony required where Guidelines are inadequate).

Although remand concerning the Vocational Expert's testimony is necessary, the Court will address Spicer's remaining arguments.  Spicer contends that she meets or medically equals Listing 1.04A for spinal disorders; and the ALJ's boilerplate conclusion on the subject is not supported by substantial evidence.  She further contends the state agency reviewers' medical

opinions on the listing were made without reviewing all of the evidence in the record.  Therefore,

the ALJ should have obtained further evidence from a medical expert.  Spicer asserts remand is

required for the ALJ to more fully develop the record and make reviewable findings concerning

the listing.

**B.      Listing 1.04A**

Listing 1.04A provides:

> Disorders of the spine (e.g. herniated nucleus pulposus, spinal
> arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc
> disease, facet arthritis, vertebral fracture), resulting in compromise
> of a nerve root (including the cauda equine) or the spinal cord.
> With:
>
> A.  Evidence of nerve root compression characterized by neuro-
> anatomic distribution of pain, limitation of motion of the spine,
> motor loss (atrophy with associated muscle weakness or muscle
> weakness) accompanied by sensory or reflex loss and, if there is
> involvement of the lower back, positive straight-leg raising test
> (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.  Abnormal physical findings of musculoskeletal

impairments may be intermittent; thus, their presence must be established by a record of ongoing

evaluation over time.  *Id.* at § 1.00(D).  Because musculoskeletal impairments frequently

improve with time or respond to treatment, the longitudinal clinical record must be assessed to

determine the severity and expected duration of an impairment.  *Id.* at § 1.00(H)(1).

"Neurological abnormalities may not completely subside after treatment or with the passage of

time.  Therefore, residual neurological abnormalities that persist after it has been determined

clinically or by direct surgical or other observation that the ongoing or progressive condition is

no longer present will not satisfy the required findings in 1.04."  *Id.* at §1.00(E)(2).  A claimant

must demonstrate the he suffered from a listed impairment for a continuous twelve-month

period.  Karlix v. Barnhart, 457 F.3d 742, 746-47 (8th Cir. 2006).

Spicer met the requirements of the listing based on her July 5, 2007 clinical findings and MRI. But only one month after her August 2007 surgery, her straight leg raise test, motor and sensory examinations were normal. In October, she had some left foot weakness and numbness, but neurological examinations otherwise continued to be normal through December 2007. The December 2007 MRI showed possible compromise of the left L3 nerve root, but Spicer continued to be neurologically intact in clinical examinations. The same was true in her examination with Dr. Mujteba in February 2008. Thus, Spicer did not meet all requirements of the listing for a continuous twelve-month period beginning July 2007.

It was not until Spicer's examination with Dr. Ensley in May 2008 that her MRI and clinical findings may have met the requirements of the listing. Her MRI showed possible left L3 or L4 radiculopathy, and an EMG study showed chronic mild left L5 radiculopathy. She had positive straight leg raise test on the left, reduced sensation of the entire left leg, some reduced strength with dorsiflexion, and some pain with range of motion of the left hip. Clinical findings were very similar on July 18 2008, although no straight leg raise tests were performed. However, ten days later, she had negative straight leg raise tests and intact reflexes and strength, with the exception of some weakness of the left ankle. Spicer did not have another full neurological examination until April 2009. Therefore, she did not establish a continuous twelve-month period where she met all requirements of the listing beginning in May 2008.

Spicer's April 2009 MRI findings and her May 2009 clinical findings by Dr. Glazier met the requirements of Listing 1.04A with nerve root compression, left foot weakness, diminished reflexes, and positive straight leg raise test. She had left L4-5 discectomy on May 7, 2009. By July 2009, she could straight leg raise to 90 degrees and motor testing was intact. Her straight leg raise tests were negative in October 2009. Spicer no longer met the listing requirements.

She did not establish that she met all criteria of Listing 1.04A for any continuous twelve-month period.

Spicer also alleges medical equivalence to Listing 1.04A. "For a claimant to qualify for benefits by showing that [her] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [s]he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Marciniak v. Shalala*, 49 F.3d 1350, 1353 (8th Cir. 1995) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); 20 C.F.R. § 404.1526.) "[When] pain is one of the listed criteria, . . . it cannot be used to substitute for others not satisfied." *Marciniak*, 49 F.3d at 1354 (quoting *Pope v. Shalala*, 998 F.2d 473, 481 (7th Cir. 1993)). The Court finds there is nothing in the record to establish medical equivalence to all requirements of Listing 1.04A when all of Spicer's impairments are considered, because pain cannot be used to substitute for lack of clinical findings such as positive straight leg raise tests or motor, sensory or reflex loss.

Furthermore, the ALJ was not required to obtain an updated medical opinion on equivalence, because the state agency medical consultants opined medical equivalence was not established; and additional medical evidence that was received into the record would not have changed the consultants' opinions that Spicer's impairments were not equivalent in severity to Listing 1.04A. *See Carlson v. Astrue*, 604 F.3d 589, 593-95 (citing Social Security Ruling 96-6p, 61 Fed. Reg. 34,466, 1996 WL 374180 (July 2, 1996). There is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) (citing *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003); *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001)).

Failure to meet or equal a listed impairment, however, does not preclude a finding of disability under the fourth and fifth steps of the disability evaluation. Therefore, the Court will address the ALJ's RFC determination.

### C.    RFC Determination

#### 1.    Functional limitations from pain and narcotic side effects

Spicer asserts the ALJ failed to include functional limitations of concentration and memory deficits, inability to drive, and need for a "sit/stand option at will" in the RFC finding. The sit/stand option, she contends, is supported by her testimony that she cannot sustain any posture for very long due to constant pain. In addition to severe back pain, she has abdominal pain associated with her prescribed narcotics. Spicer also argues her pain would cause frequent absences; and the Vocational Expert testified that three or more absences a month would not be tolerated in competitive employment.

The Commissioner responded that the objective record does not support her subjective limitations, because (1) she does not objectively have concentration or memory deficits; (2) Spicer is unable to drive when using narcotics, but driving is not a requirement for the sedentary work contemplated by the ALJ's RFC finding; (3) no treatment records contain a restriction for a sit/stand option; (4) Dr. Konasiewicz's opinion of a light RFC did not require a sit/stand option; (5) Dr. Mujteba did not find the need for a sit/stand option; (6) and the state agency physicians did not limit Spicer to work with a sit/stand option.

Residual functional capacity is "the most [a claimant] can still do despite" her physical and mental impairments. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004) (quoting 20 C.F.R. § 404.1545(a)). RFC is determined based on all relevant evidence of the claimant's ability to do work-related activities. *Id.* (citing SSR 96-8p). Spicer's subjective complaint of

concentration and memory deficits is unsupported by the record. Spicer underwent only one psychological assessment, with a finding that her memory and concentration were normal. She never complained to treating providers that her medications caused concentration or memory deficits. However, it is obvious Spicer should not drive while taking the strong doses of narcotics she used. On remand, the ALJ should include a work restriction for "no driving" in Spicer's RFC, and in the hypothetical question.

Spicer also contends the ALJ should have included in the RFC a "sit/stand at will" restriction, because she cannot sustain any posture for very long. No physician gave her this restriction. Dr. Konasiewicz believed she could return to work at a fast food restaurant. Dr. Mujteba believed she could perform light work for six hours per day without a sit/stand option. Dr. Ensley's letter says nothing about particular work restrictions, but implies Spicer could attend college, presumably a sedentary activity. Unless Spicer's subjective sitting limitation is credible, the record does not otherwise support a sit/stand at will limitation. Likewise, Spicer's contention that she would miss more than three days of work per month is dependent on the credibility of her subjective complaints of pain, and will be addressed below.

### 2. Medical Opinions

The ALJ gave significant weight to the state agency consultants' opinions. Spicer alleges this was inappropriate, because they did not examine her and did not have the benefit of reviewing all of the medical records. Spicer also claims the ALJ erred by relying on Dr. Mujteba's opinion that she could return to light work, because Dr. Mujteba only released her for part-time work, and did not have all objective evidence of her back pain. Furthermore, the ALJ gave no reason for rejecting Dr. Mujteba's limitation to part-time work. Finally, Spicer

disagrees with the ALJ's characterization of Dr. Ensley's letter, that it does not contain an opinion that Spicer is unable to work.

The Commissioner responded that Spicer's symptoms resolved with appropriate treatment over time, and Spicer told Dr. Konasiewicz she wanted to return to her fast food worker job. Furthermore, Dr. Ensley did not opine Spicer could not work. Instead, she opined Spicer was limited in the work she could do, and if she went to college, she might work in the future.

The Court agrees with the Commissioner that the ALJ reasonably interpreted Dr. Ensley's letter and concluded it did not contain an opinion that Spicer could not work. The only specific restriction Dr. Ensley gave was that Spicer should not be driving while on narcotics. Otherwise, she opined that Spicer "would not be able to have much in the way of employment." This is not the type of medical opinion that is due considerable weight. *See Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007) (discounting treating physician opinion that claimant would have "difficulties" with certain activities, because it was not a disability opinion).

The ALJ gave weight to Dr. Mujteba's opinion that Spicer could perform light work, but failed to address Dr. Mujteba's six-hour workday restriction. While it would have been preferable for the ALJ to explain why he did not include this restriction in Spicer's RFC, the error is harmless. Dr. Mujteba did not explain his part-time restriction, and neither his treatment records nor the medical evidence as a whole supports the restriction. Just prior to the time Spicer began treating with Dr. Mujteba, she told Dr. Konasiewicz she wanted to go back to her work at a fast food restaurant. Dr. Konasiewicz opined that she could return. The only difference in Spicer's condition, from the short time between when Dr. Konasiewicz released her to return to

work and when Dr. Mujteba limited her to part-time work, was that her subjective complaints of pain and limitation increased, and she sought a second disability opinion. *See Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir. 2010) (ALJ may discount medical opinion that is based largely on subjective complaints rather than objective medical evidence) (citing *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007)). Because Dr. Mujteba's part-time work restriction was based on Spicer's subjective complaints, the ALJ's failure to discuss the part-time restriction is harmless error. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("to show an error was not harmless, [the claimant] must provide some indication that the ALJ would have decided differently if the error had not occurred.")

Spicer also contends the ALJ erred by giving the nonexamining state agency physicians' opinions signficant weight. It is true that "[t]he opinions of doctors who have not examined the claimant *ordinarily* do not constitute substantial evidence on the record as a whole." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (emphasis added). However, if the ALJ has properly discounted the treating physicians' opinions, and the opinion of a D.D.S. physician is consistent with the medical evidence as of the date the physician reviewed the disability file, and consistent with the evidence in the record as a whole, the ALJ may credit the D.D.S. physician's opinion. *Casey*, 503 F.3d at 694; *Davis v. Schweiker*, 671 F.2d 1187, 1189-90 (8th Cir. 1982) (report of nonexamining physician can outweigh unsupported conclusions of treating physician if the ALJ evaluated all of the evidence and explained conclusion).

This is one of those instances. The D.D.S. physician, Dr. George Salmi, reviewed Spicer's social security disability file on May 19, 2008, and opined Spicer could perform light work with limited use of foot controls on the left; never climb ladders, ropes and scaffolds; and all other postural movements such as bending, kneeling and crouching were restricted to

occasional.    (R. at 341-48.)    This was consistent with, although more limited than Dr. Konasiewicz's opinion that Spicer could return to her job at a fast food restaurant.  It was also consistent with Dr. Mujteba's opinion, except the part-time restriction, that she could perform light work with some postural limitations.  Finally, it was consistent with the objective medical evidence, that Spicer had a history of low back pain with left leg radiculopathy and foot drop, but she improved after surgery and physical therapy.  Because the ALJ properly discounted Spicer's subjective complaints, as discussed below, the record as a whole supports the ALJ's analysis of the medical opinions.

### 3.    Credibility

Spicer contends the ALJ's credibility analysis is not a fair summary of the record.  The ALJ concluded Spicer had significant relief of her symptoms from medication, but Spicer asserts this is contrary to the record, which shows her pain continued despite the use of strong narcotics. Furthermore, the ALJ recognized that Spicer has a somatoform disorder,[10] but he did not consider how this might have exacerbated her perception of pain.  Spicer asserts the objective evidence is consistent with frequent severe pain; and the record shows her pain is aggravated by ordinary activities, and requires strong medications, consistent with disability.  Courts will respect an ALJ's credibility determination as long as the ALJ gives good reasons.  *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

The ALJ relied on minimal objective findings during the time between Spicer's back surgeries, and the appearance that she was exaggerating her pain.  The years between Spicer's back surgeries, and the months after her 2009 back surgery, the evidence supports

---

[10]   Pain disorder associated with psychological factors and a general medical condition falls under somatoform disorders in the DSM-IV-tr.  *Diagnostic and Statistical Manual of Mental Disorders* 485, 499 (American Psychiatric Association 4th ed. text revision 2000).

Dr. Campbell's assertion that Spicer was "maximizing her symptomatology." The record is replete with evidence suggesting drug-seeking behavior. In numerous trips to the ER, Spicer described minor accidents allegedly causing significant pain, although she appeared comfortable upon examinations that were normal or with minimal objective findings. See *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003) (drug seeking behavior may be used to discredit allegations of disabling pain). Under the circumstances, it was not improper for the ALJ to conclude Spicer had significant relief of her symptoms from medication. Furthermore, Spicer's daily activities of playing with her dog, visiting with people outside, visiting her mother next-door, visiting with friends, and watching television were inconsistent with her alleged extreme limitations. *See Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (doing household chores, preparing meals, and going out to eat were inconsistent with ten to fifteen minute sitting limitation).

Finally, although Dr. Trulsen diagnosed Spicer with pain disorder associated with both psychological factors and a general medical condition, he assessed Spicer with a GAF score of 65, indicating only mild functional limitations, and opined she could carry out work-like tasks with average persistence and pace. Dr. Trulsen's records do not support Spicer's contention that psychological impairments may account for her perception of severe pain and limitations. *See Casey*, 503 F.3d at 695 (no error where psychologist did not find any significant work-related activities from mental illness other than the ultimate conclusion that psychological pain disorder would preclude work). Thus, the ALJ did not err by failing to discuss Dr. Trulsen's diagnosis of a psychological pain disorder.

## IV.    CONCLUSION

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.    Plaintiff's motion for summary judgment (Doc. No. 14) be **GRANTED IN PART AND DENIED IN PART**;

2.    Defendant's motion for summary judgment (Doc. No. 19) be **DENIED**;

3.    The case be **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g), for further proceedings consistent with this opinion; and

4.    If this Report and Recommendation is adopted, that judgment be entered accordingly.

Dated:  February 11, 2013                   _s/ Jeanne J. Graham_____
                                            JEANNE J. GRAHAM
                                            United States Magistrate Judge

### NOTICE

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **February 26, 2013**. A party may respond to the objections within fourteen (14) days after service thereof.  Any objections or responses shall not exceed 3,500 words.  The district judge will make a de novo determination of those portions of the Report and Recommendation to which an objection is made.